and the Federal Reserve Board of Governors, 25144. Hold on a second, Mr. Groves. Hold on one second. No worries. If I don't see you, I'll send somebody in to find you, Your Honor. So I also understand that the appellees have split their time seven minutes to three minutes, is that correct? Seven minutes for the Federal Reserve Bank, three minutes. Okay, great. Thank you. Mr. Phillips. Thank you, Your Honor. May it please the Court, my name is Carter Phillips and I represent Banco San Juan in this case. The district court's fundamental error in this case was its decision to conclude that the bank, the Federal Bank and the Federal Reserve Board have been assigned the gatekeeping authority to exclude certain nonmember institutions from the U.S. banking system. That is a... Yes, Your Honor. I'm stunned by my lack of knowledge of the Federal Reserve Bank and the board. As a citizen, I should know more. But tell me, did they put your client out of business because they wouldn't give him a master account? What's the effect on you? I don't know about it and whether it's right and whether it's wrong, but what's the effect? I mean, this is effectively the death sentence, economically. We went from an $80 million operation to a $20,000 operation. Why does it do that? Can't they use an intermediate bank, you know, as an intermediate, the bank being a member, and stay in business that way? Apparently not, but I don't know why. Well, the difficulty, obviously, is you have to obtain a correspondent banking relationship. And when you have unsubstantiated, to be sure, but nevertheless, allegations from Federal regulators that suggest that there may be money laundering involved or other violations of Federal statutes, correspondent relationships are not that easy. Also, the board and the Fed Reserve claim that they have the exact same unfettered discretion to halt a correspondent banking relationship as they have to withdraw the master account in the first instance. So it's not candidly an alternative. And while we're at it, Mr. Phillips, so just by way of general background, because we've got this amicus brief from the Senate of Puerto Rico, what is the relationship between your client, the bank, and to the Puerto Rico economy? The purpose of the international banking entity statute that Puerto Rico created was to charter banks operating in Puerto Rico that would attract deposits from other countries in order to provide investment resources to obviously improve the infrastructure in Puerto Rico. And particularly that was critical in the wake of the hurricane disasters. Puerto Rico was significantly impacted by that, and the hope was, and candidly, if you look at the way this operated, you know, from 2011 when we applied, 2012 when we were originally granted the master account up until the board and the bank essentially changed course and decided that they were going to simply play this czar role with respect to the who gets the master account and who doesn't based on their whim, to be honest with you. Then everything fell apart at that point. And as you know, of the 16 entities that were in place, 15 of them have been eliminated as a consequence of this change. Is it your client's position that state banks or banks such as your clients have an absolute right to an account with the Federal Reserve? Not an absolute right. We have to be a depository institution, which means we have to be eligible. Assuming you meet the requirements, in other words, if there's outright criminal conduct here, there was an FBI raid, there was a Treasury Department assessment, but let's assume it's even more conclusive. The bank would still have a right to a master account in those circumstances? We would have a right to a master account. I don't doubt that the Federal Reserve Bank could do a deposit-by-deposit analysis to see if there was some reason to believe that maybe a particular deposit created a problem for them. What if all the deposits had indicia of money laundering? That is, every single deposit. Then you would grant that the bank, the Fed, would have the authority under any number of different sections to terminate the account? Well, I'm not sure I'd say that even. I think what I would say is you're allowed to maintain the master account. It's just simply you may not be able to, you may not, on an individualized basis, be allowed to make the deposits you want to make because there's some concern that there is, in fact, illegality. What's the difference between terminating it and restricting it in the way you just described? Because one acts ex ante and categorically says every transaction is invalid without any evidence of it. The other one presumably is based on some reason why a particular account has created a problem. And the reason that's important, Judge Henn, in this context is, notwithstanding the three different efforts by the bank to justify what it did here, there's not a shred of evidence of any transaction that involved any money laundering, no violations of the Bank Secrecy Act, no OFAC violations under any other circumstances. All we have are vague assertions of red flags, et cetera, and then this assertion of what I would regard as extraordinarily sweeping power to dictate who gets to come in and who gets to stay and who has to stay out. The basis for the argument that there is a right is the Monetary Control Act. Is that the principal argument? Yes, Your Honor. Section 248AC, which says all Federal Reserve Bank services covered by the fee schedule shall be available to nonmember institutions. Yes. Well, I don't know if it quite says it that way. Well, I just quoted it. How do you respond to the argument that it's really a pricing scheme and that member and nonmember banks are to be charged the same, but the language doesn't give any particular bank a right to a master account? I'll read it again to you, Your Honor. All Federal Reserve Bank services covered by the fee schedule shall be available to nonmember depository institutions. And then it goes on, and such services shall. I take the and as a conjunctive. It says they're available, and then they're priced in a fair way. Here's the argument, though, is that it says all Federal Reserve Bank services covered shall be available to nonmember depository institutions. But in another section, E, it says all depository institutions. So C, too, does not say available to all. So that suggests, and this is the account argument, that in one case we're talking about a class that is nonmember depository institutions like your client. In another case, we really mean all depository institutions. And so when Congress means all depository institutions, as opposed to sort of as a generic class, it can do that. But I don't have any doubt that Congress could have done what was described there. But if Congress were really delegating authority to the board to, in turn, delegate to the banks who gets in and who gets out of the system, you wouldn't do it on the basis of not putting the word all. Didn't Congress do that in Section 342? No. By using the May language? What it uses in 342 is the May language that regulates what deposits you can and don't have to accept. It doesn't empower you to take away the master account. There's nothing in 342 that says anything about a master account. Now, to be sure, there's nothing in 248A that says that. But we do know from the Toomey Amendment that Congress's view is that the source of authority for the banks to operate in the way that they are comes out of 248, not out of 342. The Toomey Amendment also suggests that a master account can be rejected. Right. What it says is it asks the federal government to provide information about what it has done. It doesn't purport to claim to have given any of that. But also, again, Justin, you remember when we started this exchange, I said you have to be a depository institution. So, of course, they have the right to reject if you're not a depository institution. If you didn't have a state charter, they would have the right to reject your application as well. I'm not saying there's not authority to reject. What I'm saying is you don't have the authority to decide on the basis of the safety and the soundness of the institution. If you look at the language of the Toomey Amendment, you know, it's not distinguishing between non-depository institutions and depository institutions. The thrust of it is we're talking about depository institutions and as Justice Chin indicated, it can reject a service or a request. Well, it asks for information on it. It's not a grant. There's nothing in the language of the Toomey Amendment that's a grant of authority. It simply asks the Fed and the banks to provide it with information as to what it's done. There's also nothing in there at all about revoking an account that's already been granted. All it asks about is what has the board done and what has the bank done. In the operating circular, does the bank sign the operating circular? No, it's incorporated by reference in the underlying one-page statement. It has to agree at some level to the operating circular. Well, to be candid, I mean, I think you could make a pretty good argument it's an extorted effort because in order to get in, in order to be able to exercise what I think is your unmitigated right to be able to get the master account, you have to agree to the circular even as it gets changed over time. But, okay, so you've got to agree. Extorted in some way. Some people might say that the federal governments are in the business of extorting all the time, but that's where we are. Some days I feel that way, Your Honor. But that's where we are. So there's an agreement. And in that agreement, I think, and the operating agreement or circular, as I understand it, has been in existence for decades. The Fed has in its sole discretion the power to terminate, to close an account. Yes, it does. It also has a provision that says everything it does has to be done in good faith, and it's also subject to a good faith and fair dealing obligation. But that seems to contradict. I appreciate the argument about good faith, and we can talk about that, but that seems to contradict the large argument, the broad argument that you're making, of an absolute entitlement. In other words, it is not an absolute entitlement. It is an entitlement, so to speak, subject to a good faith termination by the Fed. I would argue that the answer to that is if we didn't have the contract at all, take that out of the picture, you just look at the statutory scheme. The position of my friends on the other side is quite sweeping. It is that we stand as the gatekeeper to determine the soundness and safety of banking institutions that are chartered by other institutions, and that we get to choose on any basis that we want. I would argue that there's nothing in this statutory scheme that gets close to describing what they have here. You would not, Congress would not have done what it's done here. If you look at every other agency of the federal government, every other grant of authority, none of them tracks this approach of saying here's an absolute right to something that's valuable and important, and here's a provision that essentially gives it away at the whim of any of the agencies. That's not how Congress operates. You would expect a much plainer statement of that. And that's why this is statutorily precluded. If you get to the contract, Judge, and I appreciate that, to my view, that's just a second independent reason why what they've done is wrong. Because while it is true that that contract gives them the discretion on almost no notice to withdraw, it also imposes upon them the obligation to act in good faith. And that they can't say they did on a motion to dismiss. What's the role of the board as opposed to the bank and all the things you're complaining about? So the specific role of the board is that, you know, the board created the circular. The circular creates the three-tier system that the bank operates under to engage in the strictest scrutiny of my client, along with the class of clients apparently out of Puerto Rico and other disfavored institutions. And ultimately was asked, this is what we plan to do with the bank, and said, fine, go ahead and do it. So it was signed off on by the board. And I would argue on a motion to dismiss that that's close enough in terms of their interrelationship to say the board's responsible for that. It may turn out at the end that this was all the bank acting on a lark, and that's fine. But you shouldn't try to resolve that at a motion to dismiss at this point, Judge Sack. You should give us an opportunity to find out exactly what goes on here. Because what we're talking about is by any stretch an extraordinary exercise of power. You're talking about an $80 million profitable institution doing good business for the Commonwealth of Puerto Rico that needs it as much or more than anyone, reduced to a shell of what it was. I understand that. The question was specifically as to the board. I may go over to the president of the bank, clap him on the back and say, nice job. That doesn't mean you can sue me. No, that's true. But when I ask you, can I go forward and do this? And I have the power. Well, that's the question. I don't know that they don't. I mean, they have general supervisory authority over the banks. That we know. How far that authority plays and whether they have at other times said, we don't think you should do that, and then the banks don't do that. That would go a long way toward proving to me whether or not this is something that's totally a lark by the bank as opposed to something that the board is encouraging in order to exercise that kind of authority. That's the power to do. I can encourage them, but I don't think you can sue me. The question is the relationship between, it seems to me, between the board and the bank that permits you to hold the board responsible for something the bank did. And what I would say is that if you go back to cases like the Suse case in the D.C. Circuit, and you're talking about the Administrative Procedure Act, and what is the relationship between the instrumentality and the underlying agency? First of all, I think I can get at the instrumentality under the APA. But if, in fact, it's broader than that, and if the efforts by the board itself are really being implemented here, it seems to me that we ought to be allowed to go after those. But you're saying you don't know. You need discovery. I need discovery in order to obtain the information. Mr. Phillips, can I go back to the text of 248A, which is, I think, the principal issue that you're arguing here? Is that fair? Well, contract issue, constitutional issues. But, yeah, my number one issue is undoubtedly 248. That's the number one issue. That's a good way to put it. So, and, you know, we can go through the specific text of C2 and so on, but the provision itself is directed at the board. Just to pick up on what Judge Stack was asking about, it says the board shall publish for public comment a set of pricing principles. And, you know, I've read the Tenth Circuit decision about why would you. . . I hope you're particularly focused on Judge Bacharach's opinion there. And then Tinkovich. But I, you know, this seems to be directed to the board. Your number one argument is directed largely to the authority or not of the New York Fed to close its master account. So, I mean, these are principles, to be sure, that are supposed to guide. . . But the principles themselves, I think, are also. . . They have broader. . . Just look at the first one. All Federal Reserve Bank services. Right? That's aimed at the banks. Shall be by the fee schedule and priced explicitly. That's clearly a mandate to the banks. It's not a board thing. That's a bank thing. The second one, which, this is mine. All Federal Reserve Bank services covered shall be available. That's a right that's embedded in it. The principle is that we have a right to this master account. And then you have to find some basis on which that right's going to be divested. And as I said, if Congress intended to both allow an agency to exercise this kind of power, it would not set it up this way. And if Congress intended to ignore and to demean the regulatory functions of commonwealths and states, which is what this authorizes, it would not have done it this way. It would have set up an agency with standards, a process, and a method of dealing with it. And what they've done is they've found a statute that for 30 years they never interpreted this way, suddenly interpreted it in a completely different way to give to them amazing powers. When you say they never interpreted it this way, this goes back to the question about the offering circular, the contract, for lack of a better term. They seem to have interpreted it that way for decades as reflected in the circular. What's your response to that? Because there seems to have been a practice in the past. Look, I don't know which other banks extorted it or not. I think all of them. I'm assuming everybody. Everybody did, of course. And it's just sort of the, you know. But, see, by saying that you retain the authority to withdraw this, you retain the power to withdraw the account in its discretion doesn't say anything about on what grounds. I mean, the idea that they could, again, if you're not a depository institution or if you lose your state charter, I would argue of course you have the right to withdraw the approval. The question is if neither of those things happens, on what basis are you supposed to be doing this? And there's nothing in the circular that provides any basis. So this, now what you're arguing is not the number one argument. It's really. Well, it's good to have several in your back pocket. The APA argument, right? Yes. And so there, first, what makes me conclude that the Fed is an agency in contrast to the board? Second, there's this whole argument about abandoned arguments. So would you address both of those briefly? Why is the New York Fed an agency as opposed to a bank that is clearly and closely superintended by the board? Well, I mean, we haven't abandoned anything. I mean, the district court said, look, the bank's completely separate from the board. It's not subject to the APA, and therefore there's no way to get at them, and the board doesn't do anything here and it's got no role, and so there's nothing to do with that. And our basic attack is on that. But, you know, if it's true that the board's allowed to engage in frolic and detour, and the bank can do that and the board has no authority to do anything with regard to them, and they're off on this too, then, you know, you have a problem with the mandamus. You have a problem with the APA. Still, I think, I would have our contract claim. Obviously, you still have the constitutional claim. But we don't waive anything with respect to mandamus or the Declaratory Judgment Act. It all turned on the question of what's the relationship between the board and the bank. But at the end of the day, as I answered the judge saying, it may well be that the board's off the hook here. I just think it's premature to make that judgment until you have a better assessment of the relationship between them and what exactly went into it. It's one thing, and what went into the final decision. You know, we know that it was submitted to them. What we don't know is why they submitted it to them. We don't know what they've done in other situations like that. Just easing me on a motion to dismiss the court ought to allow us the opportunity to get to the full facts, because you're talking about the destruction of my client. I know, and I very much appreciate what you're saying. And so this is why you've got our rapt attention. I appreciate that. I thought it was just my eloquent speaking. On the relationship between the board and New York Fed, at least in this case, I thought that it was pretty clear, but perhaps I'm wrong, that as a regulatory matter, for lack of a better term, the New York Fed is not required to comply with or necessarily agree with the advice of the board. It can do what it wants. And that may relate to whether or not it's part of an executive agency. That may relate to a number of different things, but really it relates to the argument that you're making now. Well, first of all, I don't think you can decide that from a motion to dismiss based on our complaint in the first instance. There's certainly nothing. It's a matter of law. It's a matter of law. But the reality is there's no way to know as a matter of law what they have as opposed to what they, in fact, do. I mean, if it's true, I mean, we know they have general supervisory power. So the question is, how does it get exercised? And it may be that they try to go about allowing the banks to operate on their own with unfettered discretion. I would argue that that's improbable, if only because that would be a more serious constitutional delegation issue, because then what you're saying is the Congress has delegated to a quasi-private institution the power to declare the death knell to other private institutions. That by itself would be an extraordinarily sweeping and difficult problem. So I don't see how you can solve this quandary, from my perspective, on a motion to dismiss. So are you making a constitutional avoidance argument, or are you making – what are you – No, well, I mean, I guess – I mean, Judge Simkovitch, yeah, to some extent. I mean, obviously there's a due process problem embedded in here, but you can avoid all of that. But that only applies – I think that would only work if we agreed with you – well, if we agreed with you that the statute was clearly – clearly supported your position.  Or if we agreed that it was ambiguous. Right. If you thought it was ambiguous, I would think you would construe it in favor – in our favor under these circumstances, because it would raise more serious problems. I mean, that's what Judge Simkovitch said in his dissenting opinion. And I think he's right about that. I mean, again, the difficulty here is we normally think of the Fed as operating, you know, as a central bank, and the independence that goes with that, and the importance of the independence that goes with that. What is startling about this, and why I don't think it's consistent with what Congress could have intended, is the idea of conferring upon the bank, and in turn allowing the bank to confer – I mean, the board, and then conferring – allowing it to confer on the bank this extraordinary gatekeeping function that is exercised with no standards whatsoever from Congress. That's, to me, the central problem here. It's not the statutory scheme Congress would have adopted if what they've asked for is what should happen. For that reason, you should reverse, Your Honor. Thank you very much, Hughes. There's some time for rebuttal. Thank you, Your Honor. Mr. Youngwood for the Federal Reserve Bank of New York. Thank you, Your Honors, and may it please the Court. I'm going to focus on, I think, what is the central issue, which is the statutory scheme, and as confirmed by the contracts, I will note that much of what was discussed has been completely waived just by way of example of last. There's no discussion of appointments in this case. That comes out of the custodial dissent in a case where itself was found to be waived by the majority. So there are a lot of issues that were raised here that weren't raised until here, or were raised below and then later waived. We're here. But, Your Honor, focusing on the discretionary aspect and whether the bank has discretion, it has discretion and it was confirmed five times based on this record. It's confirmed by the mere text of 342 and the May, which you discussed with counsel. It was reconfirmed in 342 in 1980 when Congress amended that statute, that very language, that very language to add, to expand the class of institutions that could get master accounts, yet didn't take away the May. That's a second time. It was confirmed in 2022 statutorily in the amendment, the 248C amendment, and then parallel to this, as Your Honor's discussed with counsel, in the MAA, it includes the way may terminate, the words may terminate, and in the supplemental terms it goes even further and says sole discretion. And so among other things, the fact that these terms were somehow forced or improperly put on the bank, that's nowhere alleged in this case either. I point to the contracts as confirmation of the understanding that the discretion was there. And so, Your Honors, in many ways this is an easier case than custodia. Custodia was decided correctly. Pay services was decided correctly. But here we have the contractual language that both perhaps gives further and additional rights, although I view them as confirmatory, but certainly shows a record of a bank that understood what it was getting into and really shouldn't have been surprised when after multiple years of review, the record is clear that this review was based on facts, this review was based on work, this review was based on give and take back and forth between the parties, that the discretion was exercised after giving them multiple chances over the years. Multiple chances. This discretion was. Yes, Your Honor. Did they have to give them? Did they have to give? You say they gave them multiple chances to respond, right? Yes. Did they have to? I don't think they did, Your Honor. I think when they were late on the, in submitting papers, they were, I think it was in 2022. Yeah. They, at that point, could have terminated it. Just for being late, they didn't. I think it's, it just, it goes further. They went above and beyond and to the extent you even want to explore a due process clause claim here. And again. They did because they wanted, they gave them a little bit more time as a reference to the hurricane and so on and so forth. Why didn't they? Your Honor, I don't think the record explains why they were good enough to give them additional chances. There was a complaint by the bank that we didn't know that they were due or we didn't, we asked for an extension and we couldn't. I'm sure the record doesn't use the term good enough either. Sorry? I think he said they were good enough. Your Honor, I think, I don't, Your Honor, what I would say is I don't think they should be penalized for giving second, third, fourth chances. I don't, I don't hear you to be suggesting otherwise. But again, there's a due process claim. Well, there's a lot of problems with due process claim. You can't have a due process claim if you don't have the property right. There's no property right because of the conversation we've had. You can't have a due process claim in this because they don't comply with biddings. But even if you got to the merits and it would overlap, Your Honor, because another way, of course, to decide this is to skip whether they're an agency, skip whether if it was an agency this is reviewable, it goes to whether or not there's a standard. But under an arbitrary and capricious, if you ever even got to that, which in some ways parallels the due process claim that I don't think was pled, it wasn't arbitrary and capricious. And in a way, Your Honors, the record before you is benefited by the fact that we went through a PI proceeding. So part of the PI proceeding was the production of documents. Part of the PI proceeding was a hearing before Judge Cattell at which everything was presented. And then the judge allowed later an amendment. How much discovery was there before that? There was production of documents. There were no depositions. But I don't believe there was a request for depositions. So there was exchange of documents. There were some declarations. But no, there were not depositions. I don't think anyone asked. But it was still a motion to dismiss and not a motion to submit. There was a motion to dismiss that followed the PI hearing. But then the amended complaint had the benefit of the PI record at their disposal, and you have it in front of you for that reason. So in a way, this is a much thicker record that the judge below had and that you had because of the PI. So it's not like a clean, bare-bones plaintiff saying, how am I to know what to plead for a record? They got material. And they were able to present that both at the PI, which they lost. And the account was only closed after that and only after the district judge allowed for a short period of time to see if there would be a successful application to this court for a stay, which there was not, no stay granted. And then they amended. And then although the district court denied the third amendment or the third complaint, the district court went through the two new claims. Let me respond to the broader argument that if Congress really wanted to give the Federal Reserve the discretion to do this, it would have done so more plainly. I mean, to get there, we kind of have to read, you know, something into 342, something out of 248. But Congress could have done this much more plainly if it really wanted to do this. I suppose when cases are litigated, you can always look and say it could have been more plain. I actually don't think this is that case. I don't know how you can be more plain than the May. No, no, no, no. But this is the elephant in the reverse. So we're looking at the text 248A and, you know, and 342. And I appreciate the arguments on both sides. But I think Mr. Phillips is making the following argument. Why in the world would Congress give unfettered, in a capitalist system, unfettered discretion to the Federal Reserve banks to close any bank at its sole discretion? And, you know, I understand, obviously, I think, the offering circular, the practice. I understand the we understand the textual arguments. But the bigger argument, as Justice Chin suggested, is why in the world would it do that? And there are significant negative consequences to an unchecked Federal Reserve board and bank that can just close banks willy-nilly without anything, without any good, even good faith, potentially. So can you answer that? First, Your Honor, Congress very carefully created a complicated but independent banking system. And we know that the Fed sits in different ways than every other part of our government in terms of the board. And then it purposefully separated the regional banks to be independent and to be private, and we can get into the discussion of instrumentalities and everything else, and invested that. That doesn't mean there's not a relationship between the board and the bank. And my colleague can talk about that. So it's not unfettered supervision. The board can remove the President, for example, if such things are happening. But, Your Honor, we are not standing in front of you saying we are immune to litigation. It is conceivable there are contractual – that you could have a contractual claim. You don't under these contracts. You don't. We can talk about the limitation of liability clause. It's conceivable there could be constitutional claims. And tell me about that. So tell me about the limitations. The – Constitutional or contractual. Sure. Well, the contract could have said something it doesn't. I don't believe the contract acts to allow review of the termination, particularly in this special case where we have the supplemental terms that, you know, up it from May to in sole discretion. Right. And so on the contract, there's a limitation of liability clause. That is what my colleague is pointing to. It is not something that gives additional rights. It's something that talks about limitations of damages. What is that? It's Section 7.1, Your Honor. Let me see if I can find an exact site in the record for you. Article 7. 1590. 1590. Thank you. It's Article 7.1. Okay. And it says a reserve bank shall be liable only to an account holder and only for actual damages. I won't read it all. And it goes on, if you have lack of good faith and failure to exercise ordinary care. Your Honor, this relates to the actions taken on the account. So, for example, you failed to clear a check timely or wire funds. This is what the district court found as well. It's not eating the whole thing up and overwriting the words sole discretion that are later in the supplemental terms. It's a limitation of liability, not expanding liability where none exists. You asked about the constitutional claims.   You could have a, I think you can imagine a equal protection claim. There are hypotheticals that were given in the other. A class of one equal protection claim or a. Well, but you'd have to actually plead it. Yeah. And I don't, I'm certain it was not pled here. Just because some entities associated with Venezuela, which is what they pled below, they've now in their, I think, completely improper 28-J letter changed it to now focus only on Puerto Rico. But, and I don't know, Your Honor, about the 15-16. They didn't get those from us. They got them and we've read what you've read. But I'll just say it's true. It doesn't prove an equal protection claim because other people like you got denied. When you have a whole record, this is what Judge Patel found because he was looking at 9 out of 10. Codal. Codal. Codal. Sorry. Codal. Thank you. He was looking at a collection of very similar allegations on the motion to amend for the third complaint, and he found among things that you didn't satisfy Bivens and other things, technical but completely appropriate things, again, they've waived that on appeal. They don't even argue about the Bivens on appeal at all with respect to equal protection, not on their opening brief. But if you have an entity in a class and you have a record, as we have here, that demonstrates the reasons, you can't just say because others who wear my color shirt or are from where I am have had similar treatment that there must be discrimination on the equal protection clause. And missing, missing completely from their discussion in their letter yesterday, although it's in our papers and it's in the underlying record, is they have narrowed gerrymandered, I suggest to you, the class to just IBEs and IFEs, and they skip the fact that you cannot say that there are not, by public records, more than 80 Puerto Rico-based financial institutions that do have access to master accounts. This gets back to the very first questions. Either, either through direct that they have them or through corresponding bank relationships. And, Your Honors, I'm happy to keep going, but it kind of circles us back to the very first question. This action, obviously, they didn't like it. They sued. They sought a preliminary injunction. They wanted a master account. They wanted to keep it. I don't doubt that. But we didn't lock them out of the banking system. There are corresponding bank relationships. There are other ways to get access. The fact that dozens, hundreds, maybe thousands of others in the country do that, and they didn't want to do that, that's not the New York Federal Reserve Bank's fault. Federal Reserve Bank had the power under statute. Are there other institutions in Puerto Rico like this institution that did that? There are other Puerto Rico institutions. This is on the, I think it's the board's website, the board's website, that, yes, that show, and again, Your Honor, we make reference to it in ECF 31-983 in general makes reference to it. But we can also, if you want, provide the court with the website reference, if that's useful, that, yes, there are more than 80 of them that have, can get access to master account services. And so their letter from where this.  Sorry? And do get access. And do. And do. And yes, thank you for that correction, Your Honor. Yes, they do. Thank you, Your Honor. I'm sorry. Just stay where we are, Mr. Hewitt. So the, I think, limitation, which appears in 1602 Article 3, is if the bank determines in its sole discretion, so this is the limitation, that the customer's access to a financial service, so the master account, poses undue risk to the bank or another reserve bank. The bank may immediately and without prior notice take any of the measures described in this section. That's what, that's what the reserve bank relied on. Yes, Your Honor, that's, that is correct and it's consistent with, although, it's consistent with the guidelines themselves and item, I think, I believe it's, I get the right number, I think it's five or six of the guidelines. And is, is the, is the factor or the, are the factors that the Fed considers in making that determination in its sole discretion, are those, are those publicly available or are they only made known to the bank, to the depository institution? Well, the guidelines are available. The document you read from is not a secret document either. It's a standard document. The back and forth between the parties, I believe, is filed under seal here and I, I don't believe the public could get access to all of that. Okay. Thank you very much. Mr. Chadwick. And Your Honor, I think I said guideline six. It's guideline number five is, is applicable here. Okay. Thank you. Good morning and may it please the Court. I'd like to pick up on a couple of points that Mr. Phillips raised this morning and also in the briefs. But the first is, I think he said that in section 248A that some of those pricing principles are directed directly to reserve banks. And I think this is clear in the briefing, but if you were to look at the statute, I think it would be quite clear that that's not the case. Each of those principles is something the Board was to consider in setting the fee schedule. There's no directive to the reserve banks there. You know, there's lots of indicia of that beyond the fact that on their face they relate to the ways in which the Board will set the pricing schedule. Well, so, A, I'm sorry, B8, any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds, isn't that directed to the Federal Reserve banks? No, Your Honor, because if any new services are offered, all this is saying is that service has to be added to this pricing schedule. So the Board publishes the pricing schedule for each of these enumerated seven items here. And then if there's, you know, those are the ones that exist at the time of the statute. What this is saying is if the Federal Reserve banks are going to offer some additional services, then the Board has to set the prices on the pricing schedule, has to ensure that those prices are equivalent for member and non-member depository institutions. Okay. I mean, looking at C1, all Federal Reserve bank services covered by the fee schedule shall be priced explicitly. That seems to be implicitly a command to Federal Reserve banks. I would disagree, Your Honor. Okay. So maybe I've fundamentally misunderstood this entire section. Let me try to explain it as best I can, Your Honor. The Board of Governors, Federal agency, publishes a schedule that sets prices for all of these services which each of the 12 Reserve banks offer. And the banks have to follow this? The banks have to follow it, Your Honor. And the banks have to offer the same prices to members and non-members. They don't have any choice about that. Yes. Yes, Your Honor. Publicly available on the Board's website. And maybe we're speaking at sort of different levels, but that seems to me to be a command by the Board to the banks that you've got to do certain things. You've got to provide set fees and so on, and you've got to publicize those. But you're saying, no, that's not a command or an instruction to the 12 banks. It's something else. That's what I misunderstood. I may be responding to a slightly different understanding of your question, Your Honor. And that's helpful. I'll try to explain it a little bit more clearly. The commands in the statute are directed to the Board. The Board sets the price schedule. There's no doubt that the Reserve banks have to follow the Board's pricing schedule. I don't think there's any question about that. But what I read or understood Mr. Phillips to be saying is that there are statutory commands within 248C that are directed to the Reserve banks, that are things that the Reserve banks must do. And what I'm saying is that's not the case, that this is purely – these are all pricing principles. Yes, Your Honor. What about 2, subsection 2, all Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions? So I think, Your Honor, that that still is directed to the Board. If the Board published a pricing schedule that said this is only available – this schedule is only available to member institutions, then the Board would be in violation of the statute. And that would be something that an APA claim might be brought against the Board for. But also remember, these services were free to member banks before the Monetary Control Act. When the Board was directed by Congress to set this fee schedule, it had to come up with what these fees would be. And part of that consideration was competitive considerations. All these services are also offered by private competitors to the Federal Reserve System. So when the Board was setting these prices, it had to do so in a way that was not undercutting the private competition. And one of those factors is there's going to be a lot more banks accessing these services. So this was before 1980. So this is in 1980. Just explain to me, what triggered that? In other words, you know, before 1980, you've got to be a member depository institution in order to access these master accounts. After 1980 or as of 1980, we're going to make them available to, you know, I guess we could quibble or dispute a class or all. But what triggered that? So there's a complex set of factors, Your Honor. I think at the top of that list, you know, this is called the Monetary Control Act for a reason. The Fed wanted more reserves. It wanted more deposits. And it couldn't get deposits from nonmember banks because Section 342 didn't allow it. It only allowed it from member institutions. So the Fed wanted these additional deposits. The Fed also was perfectly— As an inflationary, as a monetary policy for what reasons? Yes, to control monetary policy for inflationary control reasons. That was one. There's also a lot of complaints that the Fed was undercutting the private competitors by offering these services to member banks for free. So those factors all played in. But it is the case, and I think it's important to understand that the Fed wanted additional deposits. This was something that the Fed desired. So the idea that, you know, the Fed's got some desire to not invite these deposits or not have these institutions receiving services, I think, is contrary to the history. How often with respect to member depository institutions does the Fed terminate a master account? How many member depository institutions are there? Oh, I don't know off the top of my head, Your Honor. Probably hundreds or thousands. Yeah. So a couple of responses to that. One, this is not a matter of public record, so that's not publicly tracked or hasn't been. Two, with respect to member banks, you have to understand that they are directly supervised by the Board of Governors. So it's a federal regulator. The Board supervises reserve banks and also supervises commercial banks, member banks. So the Board has significant supervisory and regulatory control with respect to member banks. So it wouldn't necessarily be the case that the first step the Board might take, if there was a DSA, ML problem, or something with a member bank. They would take supervisory actions. Four, you may not need an offering circular. You don't have to answer this, but with respect to a member bank, but you need offering circulars. You need certain clear parameters. This is the argument with respect to non-member depository institutions over which you don't have that supervisory authority. I think that's an important point, Your Honor. The Fed, the Board, and the Federal Reserve Banks don't have the kind of insight. The Board has deep insight into member banks. It has plenary authority to review books and records. It can see everything on its own. And so that's significant. And it can take enforcement action. And it doesn't have that authority with respect to non-member banks. But I will say it's also— When you say it can take enforcement action with respect to the member banks, there's a laid-out mechanism. We don't have to get into the details. And you cannot take enforcement action other than terminating or suspending the master accounts for a non-member. Well, the Reserve Banks have the tool. It's an important tool for them to protect their own interests, to protect national economic interests, to prevent money laundering. They have that tool with respect to non-members that are accessing their accounts and services. That tool does not exist. The tools that the Board has with respect to the members don't exist for non-members. So there would be—assuming that Congress understood these differences, that might explain the difference between its treatment of non-member depository institutions as opposed to all depository institutions. But I will—I think it's important to also understand, Your Honor— Am I right or wrong about that? Sorry, I didn't quite—could you say the question? So that—what we're describing, these differences in enforcement, supervisory authority, and so on, might explain Congress's decision as part of the scheme, the monetary scheme, to distinguish how it treats non-member depository institutions and all depository institutions, including member banks. It might explain the difference in treatment where, in the case of a non-member depository institution, we—because we don't really have any supervisory authority, we want to be able to terminate at our sole discretion. But maybe I'm missing something. Well, let me clarify a point that I think may help, Your Honor. The reserve banks can terminate a member bank's master account as equally as they can as a non-member bank. What I'm saying is they don't necessarily need to move to that tool because they— because the Fed has a lot of tools with respect to the member banks. So there's not a distinction, I think, between the ability of a reserve bank under its Section 342 authority to reject deposits or close a master account across the board, members or non-members. And 342 is the statute to which the board would resort or the banks. Correct, Your Honor. And BSAI's reading of 248A would be, for a lot of reasons it's problematic, but one additional reason is that the language they seize on shall be available to non-member depository institutions. It doesn't—that doesn't address member banks. And so I just think it's an inconsistency in their reading that, you know, along with all the other difficulties in their interpretation, that's worth noting. All right. Can I ask you the same question, I think, that we all have, which is the question that was posed to Mr. Youngwood? This is an extraordinary amount of power, and I understand with the help of the background that you've all provided, this is an extraordinary amount of power. I think, with the exception of the good faith requirement that Mr. Youngwood pointed us to in 6.2, it's nearly unfettered. Is, in your view, as a counsel for the board, what are the other limitations that we've not heard yet about? Well, just to back up, Your Honor, the Reserve Banks, there's a lot of different claims that can be brought against the Reserve Banks. They do not claim sovereign immunity. They've got a sue-and-be-sue clause under the Federal Reserve Act. And so, you know, to imagine every possible claim that could be brought in every possible circumstance is difficult, but I think some have been brought up today, the equal protection class of one. I don't read anything that the Reserve Bank has filed in these cases to disclaim all constitutional claims. I think they have rightly determined that there's not a vested property right in an account. But so that's one example. There could be state law claims. There's just not an APA arbitrary and capricious claim that goes against the Reserve Bank. That's Congress's structure. I understood that the board and maybe also the bank, the banks, disclaim liability under state law. I don't know that it's true, Your Honor, that they disclaim all liability under state law. That would represent the Reserve Bank, but I'm not sure that that's an accurate statement. It does seem to be at least, well, implicit or explicit limitation on the ability to terminate, and that there has to be a risk, a risk to the banking system, it seems, as opposed to, you know, some other arbitrary reason. Does that? I think that's correct, Your Honor. I think that's part and parcel of why the board issued the guidelines, which are not binding regulations. They are guidance that are given to Reserve Banks, the idea being that, you know, some level of consistency across the system is in the public interest. But I think, you know, beyond just what legal claims can be brought, Your Honor, the board does have supervisory authority with respect to Reserve Banks. Congress obviously is monitoring the situation in terms of, you know, they've amended the very provision of the statute that we're discussing today without changing, you know, what's been widely understood to be a discretionary factor. So it's not as if there aren't eyes on these decisions. And obviously, beyond just the legal claims, whether it's an equal protection claim, whatever it might be, there's lots of other mechanisms why true arbitrariness or discriminatory action or any other kind of, you know, sort of beyond the pale, non-risk-based thing can be made. So it says sole discretion, but you're saying that that's cabined by other provisions, other guidelines, and so forth. That's correct. Thank you very much. Turn off that phone, please. Thank you. Mr. Phillips. Thank you, Your Honors. I'll try to make three or four points, and I appreciate your indulgence in allowing me to go beyond my allotted time. But thank you. First of all, the suggestion by my friend that the 1980 Act somehow reinforced the idea that this is broad discretion granted to the board and the banks to regulate nonmember institutions is flatly consistent with all the statute does is extend to my client and similarly situated nonmember institutions the protections that the member banks had to begin with. But it doesn't purport to extinguish the power under 342. In fact, as Justice Chin's question suggested, in fact, it specifically reserves the authority to reject. Well, it clearly, I mean, the old Supreme Court case that says you could reject was to reject nonmember institutions. Congress expressly overruled that portion of the Farmers case from the Supreme Court. You cannot reject nonmember institutions simply because they are nonmember institutions. But it sounded to me like the bank was saying, well, maybe the board couldn't do that, but the bank has the authority to reject nonmember institutions simply because they're nonmember institutions. That cannot be squared at all with this statutory scheme. And when you talk about the good faith component of this, I'll switch gears and look at the contract part of this. They say the good faith component of this only applies to things like mistakes with wire transfers or other deals like that. It's pretty remarkable to me to say that you have full liability and recovery if they screw up in the timing of making a deposit or taking a deposit. You have no liability whatsoever if you wrongly exclude a nonmember institution from its access to the U.S. banking system. I mean, no contract is written like that. I mean, there is an express good faith requirement. There is an implied duty of good faith and fair dealing. And those issues cannot be resolved on the basis of a motion to dismiss. And then with respect to the correspondent banking relationship, this I find pretty remarkable. If what my client had been doing was so evil, why is the bank and the board so ill-covered? Well, the answer is just go get another bank to do it for you. The point is if you insist on correspondent banking relationships, what you're saying is you're going to deprive us of access, you're going to take away our right to fees on an equal basis. You're taking the guts of what the 242A-C protection is and destroying it. If you had good reason for that, that would be one thing. But they don't have good reason for that. There are nothing but red flags. There are not a single instance of money laundering or anything else in this case. Finally, two last points I'd like to make. First of all, how do you not take away the account of Deutsche Bank when it, in fact, engages in money laundering, bank secrecy? You don't do anything about that. There isn't a legal protection claim here. There is an equal ‑‑ well, in our amended complaint. But there's not ‑‑ well, if you actually ‑‑ so it's not a form of equal protection claim that seems to me to be of the sort of argument or to support the argument that you're making right now. Right. And I'm not making this as an equal protection argument. I'm really making this as an arbitrary and capricious argument, Your Honor, that they're not treating the member institutions and the nonmember institutions fairly in certain cases where they clearly ‑‑ You've got a due process claim, arbitrary judgment claim. And so the APA claims was just the arbitrary and capricious argument.  But it's not ‑‑ Well, we do have an amendment. We did amend. We offered another amendment, which has a true Fifth Amendment equal protection claim. The district court disallowed us the opportunity to make that amendment. And that's in ‑‑ Is that before us? Yes, that's before you. That's one of the ‑‑ That is the ‑‑ Right. That's that point. Finally, the last thing I want to say ‑‑ I just want to go back to the extraordinary power of the claim here. Because if you affirm that this statutory right exists, then tomorrow when new people are running the board and new people are running the bank and the bank and the board decide, you know what, we're not going to approve any state institutions that come out of states that have democratic governors because we don't believe they regulate their banks as carefully as other institutions. There will be no authority for this court to say that's illegal because they have unmitigated, unfettered discretion to do what they claim to do here. Why wouldn't 7.1 or some analogous provision kick in? In other words, why wouldn't good faith ‑‑ They would say that we have a good faith basis for believing that those regulators are not as skilled as ours, which is the same point they made about Puerto Rico. They said the Puerto Rico regulators are not as good as other regulators. I think that's offensive, to be candid with you. Put that aside, there's no reason they couldn't make exactly the same point about any democratic state chartered institution if that's the decision they decide to make. This court should be really reluctant to authorize that kind of power. If there are no further questions, thank you for ‑‑ Thank you very much, very helpful. Obviously we'll reserve the decision.